UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATHANIEL K.,[1] | ) |
| Plaintiff, | ) Case No. 17-cv-8030 |
| v. | ) Judge Sharon Johnson Coleman |
| ANDREW MARSHALL SAUL, Commissioner of Social Security, | ) |
| Defendant. | ) |

**MEMDORANDUM OPINION AND ORDER**

Plaintiff Nathaniel K. brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"), 42 U.S.C. §§ 416(i), 423. Nathaniel, by counsel, has filed a motion for summary judgment asking the Court to reverse or remand the Administrative Law Judge's ("ALJ") decision and the Commissioner has filed a cross-motion for summary judgment in response. After careful review of the record and the parties' respective arguments, the Court concludes that substantial evidence supports the ALJ's residual functional capacity assessment, the ALJ reasonably assessed the medical opinions that Nathaniel specifically challenges, and the ALJ properly assessed Nathaniel's subjective statements. The Court therefore denies Nathaniel's motion and grants the Commissioner's motion for summary judgment.

**Background**

Nathaniel filed an application for benefits on May 23, 2014, alleging a disability onset date of

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

February 18, 2014. His application was denied initially and upon reconsideration. Nathaniel then requested a hearing before an ALJ, which was held on June 21, 2016. At the hearing, a vocational expert testified along with Nathaniel. On September 28, 2016, the ALJ issued a decision denying Nathaniel's application. The Appeals Council then declined review, leaving the ALJ's February 2017 decision as the Commissioner's final decision reviewable by this Court under 42 U.S.C. § 405(g).[2]

**Judicial Standard of Review**

Courts uphold an ALJ's disability determination if the ALJ uses the correct legal standards, the decision is supported by substantial evidence, and the ALJ builds an accurate and a logical bridge from the evidence to the conclusion. *Jeske v. Saul,* 955 F.3d 583, 587 (7th Cir. 2020); 42 U.S.C. § 405(g). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Surprise v. Saul*, 968 F.3d 658, 662 (7th Cir. 2020) (citation omitted). A federal court's review of an ALJ's decision is deferential, which means that courts do not reweigh the evidence or substitute their judgment for that of the ALJ. *Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019).

**Disability Determination Standard**

A person is disabled under the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security

---

[2] The Court notes that the decision in this matter has been delayed due, in part, to a partial government shutdown and the COVID-19 public emergency, at which time this matter was inadvertently overlooked.

Administration has set forth a five-step sequential evaluation for determining whether an individual is disabled. *Krell v. Saul*, 931 F.3d 582, 584 (7th Cir. 2019). This evaluation considers whether (1) the claimant has engage in substantial gainful activity during the period for which she claims disability; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's severe impairment or combination of impairments is one that the Commissioner considers conclusively disabling as enumerated in the regulations; (4) if the claimant does not have a conclusively disabling impairment, whether she can perform past relevant work; and (5) the claimant is capable of performing any work in the national economy. 20 C.F.R. § 404.1520.

**ALJ's Disability Determination**

Here, the ALJ found that Nathaniel has not engaged in substantial gainful activity since February 18, 2014. At step two, the ALJ found that Nathaniel has the severe impairments of traumatic brain injury, major depression, anxiety with posttraumatic stress disorder, carpal tunnel syndrome, migraines, and hypersomnia. The ALJ also noted that Nathaniel has been diagnosed with non-severe impairments, including asymptomatic HIV with an undetectable viral load, hypothyroidism, L5/S1 transitional vertebrae, lumbar radiculopathy, sleep apnea, fatigue, status post cholecystectomy/gallbladder disease, pituitary dysfunction, essential hypertension, and narcolepsy. At step three, the ALJ concluded that Nathaniel did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1.

At step four, the ALJ decided that Nathaniel has the residual functional capacity ("RFC") to perform light work except "only frequent reaching, handling and fingering; only occasional stooping, couching, crawling, kneeling, and balancing; only occasional climbing of ramps and stairs; no climbing ladders, ropes, or scaffolds; no unprotected heights, heavy equipment, or operating

machinery." The ALJ additionally stated that Nathaniel is "limited to the performance of simple work." As such, the ALJ concluded Nathaniel is unable to perform any past relevant work.

At step five, considering Nathaniel's age, education, work experience, and RFC, the ALJ concluded there are jobs in significant numbers in the national economy Nathaniel can perform, such as assembler and mail clerk.

**Analysis**

Nathaniel contends that the ALJ erred for several reasons, including (1) the ALJ failed to properly evaluate Nathaniel's RFC, (2) the ALJ improperly assessed opinion evidence, and (3) the ALJ improperly rejected Nathaniel's subjective statements about his symptoms and limitations.

*RFC Evaluation*

First, Nathaniel argues that the ALJ failed to properly evaluate his RFC by suggesting that the limitation of simple work would accommodate his difficulties with concentration, persistence, or pace. Nathaniel argues that the ALJ ignored Dr. Larsen's findings that Nathaniel's performance on memory tests was low and that his medications and excessive daytime sleepiness might affect cognition. Nathaniel mischaracterizes Dr. Larson's report. As the ALJ described, Dr. Larson's psychological exam indicated that Nathaniel's cognitive impairment was mild. In both informal interaction and formal exams, Nathaniel's memory and attention were relatively normal. Dr. Larson further found that Nathaniel's language function and processing speed were at above average and average levels. There was some variation in his concentration, contributing to the mild cognitive impairment. The ALJ, therefore, did not ignore Dr. Larson's findings, but described them fairly and accurately.

In determining that Nathaniel is able to perform simple work, the ALJ further noted that Nathaniel scored an average IQ in evaluations performed by both Dr. Larson and Dr. Valdes. Dr.

Valdes additionally found that Nathaniel had average auditory memory. The ALJ relied on state agency psychological consultants, who indicated that Nathaniel can understand and recall simple instructions, and state agency medical consultants, who limited Nathaniel to a range of light level work. Moreover, the ALJ highlighted that Nathaniel reported that he is able to spend several hours on the internet in the evenings, showing that he has an ability to remain on task for an extended period of time. Additionally, the ALJ described that Nathaniel is able to drive long distances and completed a Master's degree while on short-term disability, suggesting the same. Thus, substantial evidence supports the ALJ's determination that the limitation of simple work would accommodate his difficulties with concentration, persistence, or pace.

Next, Nathaniel argues that the ALJ failed to adequately evaluate the effect of Nathaniel's hypersomnia on his ability to sustain full-time work. To the contrary, the ALJ addressed Nathaniel's hypersomnia at length and reasonably. The ALJ concluded that Dr. Attarian's assertion that Nathaniel can only be awake for five hours throughout the day was challenged by substantial evidence provided by other experts that indicated Nathaniel could have more waking hours by making changes to daily activities, lifestyle, and medication. The ALJ accounted for Nathaniel's hypersomnia and fatigue in the RFC by limiting him against unprotected heights, heavy equipment, climbing ladders, or operating machinery.

Nathaniel further argues that the ALJ did not account for Nathaniel's need for naps. He argues that Dr. Zouein opined that Nathaniel should take a mid-day nap and that Dr. Herdegen similarly suggested that Nathaniel's performance would be optimized with naps. Nathaniel's account is contradicted by the record. Dr. Zouein, in his treatment notes indicated that mid-day naps could be one way to prolong wakefulness in the evenings—only one among several suggestions to determine if it would improve wakefulness, including adjusting medication and lifestyle. Dr.

Herdegen was Dr. Zouein's supervisor and saw Nathaniel on the same visit. He similarly noted a combination of lifestyle changes could increase alertness. Neither doctor indicated naps were necessary for Nathaniel and at most suggested Nathaniel try napping among other things to see whether it increases alertness. This is consistent with the ALJ's findings. In sum, the ALJ sufficiently considered Nathaniel's hypersomnia when evaluating his work-related impairments.

Nathaniel also argues that the ALJ failed to adequately evaluate the effects of his headaches on his ability to sustain full-time work, but fails to identify any limitations from his headaches advanced by any medical source. The ALJ did discuss Nathaniel's history of migraines, including a discussion of trauma to his head and the resulting tension-type headaches. The ALJ additionally compared Nathaniel's various complaints of pain to his medical history and MRI imaging, concluding that the intensity of self-reported pain was not supported by the objective record. Accordingly, the ALJ did include Nathaniel's migraines as part of his FRC assessment. Finally, even if the ALJ's decision was flawed, any alleged error is harmless. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019). Nathaniel has not explained what work restrictions would address his limitations in relation to his migraines.

*Opinion Testimony*

Nathaniel argues that the ALJ improperly weighed several expert opinions. First, Nathaniel takes issue with the ALJ affording little weight to treating physician Dr. Attarian. In claims that were filed before 2017, a treating physician's opinion is entitled to controlling weight if it is supported by sound medical evidence and a consistent record. *See Gebauer v. Saul*, 801 F. App'x 404, 409 (7th Cir. 2020); 20 C.F.R. § 404.1527(c)(2); SSR 96-8p. If an ALJ determines controlling weight is not appropriate, then that treating physician's opinion should be weighed based on the nature and extent of the treatment, the treating source's area of specialty, the degree to which the opinion is

consistent with the record and supported by other evidence, and other factors *Id.* If the ALJ considers these factors and "minimally articulates" his reasons, his decision to discount the weight given to a treating physician will be upheld. *See Olivas v. Saul,* 799 F. App'x 389, 391 (7th Cir. 2019). The ALJ noted several reasons for not giving Dr. Attarian's opinion controlling weight. The medical record indicates that Dr. Attarian saw Nathaniel had only one or two appointments with Nathaniel and it is difficult to determine what sort of workup he performed. Some findings of Dr. Attarian were unsupported by Nathaniel's medical record as a whole, as discussed above. Thus, there is substantial evidence in the record supporting the ALJ's decision to afford "little weight" to Dr. Attarian's opinion.

Additionally, Nathaniel argues the ALJ failed to give proper weight to the opinion of non-treating clinical neuropsychologist, Dr. Valdes, who opined that Nathaniel had significant work-related limitations. An ALJ considering the weight to afford a non-treating physician's opinion must examine several factors. This inquiry focuses on (1) how well the non-treating physician supported and explained his opinion, (2) whether the opinion is consistent with the record, (3) whether the physician is a specialist in a relevant field, (4) and any other relevant factor of which the ALJ is aware. 20 C.F.R. § 404.1527(c)(2). Here, the ALJ found Dr. Valdes' opinions "inconsistent with the record as a whole, including [Nathaniel's] average IQ scores, his varied activities of daily living and ability to function in public, such as going on several out of state trips, and [the] unremarkable mental status examination findings noted by treating sources." Additionally, the ALJ noted that Dr. Valdes only saw Nathaniel once and completed her evaluation in 2014, two years prior to the ALJ's decision. As such, her evaluation did not take into account the improvements noted in Nathaniel's medical record and was inconsistent with a more recent evaluation conducted by Dr. Larson.

Accordingly, the ALJ's decision to afford little weight to Dr. Valdes's opinion is supported by substantial evidence.

Next, Nathaniel takes issue with the ALJ affording significant weight to the evaluation of neurocognitive expert Dr. Larson, who did not treat Nathaniel. Nathaniel argues that the ALJ's evaluation of Dr. Larson's opinion unreasonably highlighted isolated segments of treatment records that supported the ALJ's findings, yet ignored portions of the same records that did not. The ALJ explained that he provided significant weight to Dr. Larson's opinion because his findings were generally consistent with the medical record as a whole and the DDS assessment, along with Dr. Larson's own mental status examination findings and IQ test. The ALJ noted that Dr. Larson's evaluation had the additional benefit of being more recent by comparison to Dr. Valdes's. Moreover, The ALJ correctly summarized Dr. Larson's evaluation, taking note that Nathaniel had mild cognitive impairment. Nathaniel's memory and concentration exams were largely average. While Dr. Larson reported that Nathaniel's concentration and memory could have declined as compared to his pre-morbid condition, he was nonetheless capable of participating in satisfying activities and independent living. Overall, the ALJ's decision to afford significant weight to Dr. Larson's evaluation is supported by substantial evidence.

Nathaniel finally takes issue with the ALJ's decision to afford significant weight to State agency psychological consultants, Drs. Keith Bauer and J. Patrick Peterson, because the opinions were consistent with the RFC. Nathaniel argues that the ALJ should have decided about how much weight to give them before formulating an RFC. Nathaniel's argument is misleading. When the ALJ noted that the State consultants' opinions were consistent with the RFC, he was referencing their conclusion that Nathaniel should be limited to light work, which was then reflected in the RFC. Their conclusions supported the limitations described in the RFC, not the other way around. The

ALJ additionally noted that the State consultants' opinions were consistent with the medical record and treatment history. Substantial evidence, therefore, supports the ALJ's decision to afford significant weight to their opinions.

*Subjective Statements*

Nathaniel challenges the ALJ's assessment of his subjective statements regarding his medical condition. When evaluating a claimant's subjective symptoms, the ALJ follows a two-step process. See 20 C.F.R. §§ 404.1529(a), 416.929(a). First, the ALJ considers whether the claimant's impairments could reasonably be expected to produce the symptoms he alleges. 20 C.F.R. §§ 404.1529(b), 416.929(b). Second, the ALJ considers whether the record supports the severity of the symptoms he alleges. 20 C.F.R. §§ 404.1529(c), 416.929(c). To do so, the ALJ will look to the claimant's reported activity levels and treatment received. The ALJ's credibility finding gets special deference and will only be overturned if it is "patently wrong." *Apke v. Saul*, 817 F. App'x 252, 257 (7th Cir. 2020).

The ALJ concluded that Nathaniel's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms" but that his "statements concerning the intensity, persistence, and limiting effects of th[o]se symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." The ALJ considered Nathaniel's exam results, such as MRI of the brain, his treatments, such as the carpel tunnel release, and his improvement over time. The ALJ compared this evidence with Nathaniel's statements during his testimony and statements he has made to various physicians. The ALJ considered Nathaniel's testimony about his limitations, but also about the activities he participates in like working out at the gym, studying, surfing the internet, and trips around the country. The ALJ additionally noted discrepancies in Nathaniel's reporting of what led to his head injury in 2013 and

his use of illicit drugs as further eroding the consistency of his allegations. Looking at all of this evidence together, the ALJ determined that Nathaniel's statements about the level of pain and functional limitations are not supported by his medical record or the sorts of activities he is able to engage in. Substantial evidence exists to support the ALJ's credibility finding.

Nathaniel requests that the Court read the ALJ's statement that "[t]he claimant's allegations are determined to be less than fully consistent with the evidence" to mean that the ALJ was applying some new standard to the evidence requiring complete consistency between Nathaniel's statements and the remainder of the evidence. That is not a reasonable, common sense reading of the ALJ's analysis, which cites the correct standard at page six of the decision. *See Winsted v. Berryhill,* 923 F.3d 472, 478 (7th Cir. 2019) ("The court applies a common-sense reading to the entirety of an ALJ's decision.").

**Conclusion**

For the foregoing reasons, the Court denies plaintiff's motion for summary judgment [14] and grants the Commissioner's summary judgment motion [21]. The Court affirms the ALJ's decision. Civil case terminated.

IT IS SO ORDERED.

Date: 11/24/2020

Entered: _____
SHARON JOHNSON COLEMAN
United States District Court Judge